UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PB GROUP, INC.,

        Plaintiff,

vs.

PROFORM THERMAL SYSTEMS, INC.,
and NORTH AMERICAN SPECIALTY
INSURANCE COMPANY,

        Defendants,

and

PROFORM THERMAL SYSTEMS, INC.,

        Counter-plaintiff,

vs.

PB GROUP, INC.,

        Counter-defendant.

_____/

Case No. 06-CV-15755
HON. GEORGE CARAM STEEH

ORDER GRANTING DEFENDANT PROFORM'S MOTION
FOR SUMMARY JUDGMENT (#21) AND
DENYING AS MOOT DEFENDANT PROFORM'S MOTION FOR LEAVE TO AMEND
ITS ANSWER AND COUNTERCLAIM (#21)

Defendant Proform Thermal Systems, Inc. (Proform) moves for summary judgment of plaintiff PB Group's (PBG) claims of breach of contract, unjust enrichment, quantum meruit/quantum valebant, and promissory estoppel with respect to a construction project at the University of Michigan. Defendant North American Specialty Insurance Company (NASIC) joins and concurs in the motion. Proform also moves for leave to amend its answer to add affirmative defenses and counterclaims of fraud against PBG and PBG

owner Kevin Lewis. A hearing on the motions was held on March 27, 2008. For the reasons set forth below, Proform's motion for summary judgment will be GRANTED. Proform's motion for leave to file an amended affirmative defense and counterclaim of fraud will be DENIED as MOOT.

## I. Background

PBG filed this diversity action on December 27, 2006 alleging contractor Proform and surety bond issuer NASIC owe $166,561.00 for materials and services PBG provided toward construction of a Biomedical Science Research Building at the University of Michigan. PBG alleges Proform is liable under theories of breach of contract, unjust enrichment, quantum meruit/quantum valebant, and promissory estoppel. On February 28, 2007, Proform filed its answer, affirmative defenses, and counterclaims of breach of contract, negligence, breach of express warranty, breach of implied warranties of fitness for a particular purpose and merchantability, promissory estoppel, and negligent misrepresentation.

The pleadings convey that non-party Gilbane/Clarke Joint Venture (Gilbane) was the construction manager for the project, Proform was a Gilbane contractor, and PBG was a Proform subcontractor. Proform and PBG executed an August 20, 2003 Purchase Order requiring PBG to provide materials and services toward the construction of specialized environmental rooms within the Biomedical Science Research Building:

Service to be performed:

Vendor to furnish complete all engineering, engineering documents and submittals [sic] including all materials and equipment, MI state sales tax and freight, environmental rooms as outlined on the University of Michigan Biomedical Science and Research Building-Design Release 5-Environmental Room Specification-Section 11615, pages 1-18, dated 11/04/02 as

supplemented by the Project Manual - Release 5B-Volumes 1 & 2, dated February 26, 2003. Off-loading and installation of equipment by others. In addition to those items specifically outlined in the specification, the vendor must comply with the full letter and intention of that document and all subsequent revisions, addendums, post bid supplements, and additional requirements as outlined on executed contracts between Gilbane/Clark and Proform that may pertain to this subcontract. Additionally, the subcontractor (PB Group/Insulated Structures) agrees to cooperate with Proform in providing complete and thorough engineering and manufacturing support throughout the duration of the project, including bearing full physical and financial responsibility for the construction and test operation of a sample room and other support as required to maintain schedules and to provide the Owner with a complete and professional room installation that complies fully with the specifications.

Upon receipt of this purchase order and in accordance with a prior agreement with Veronica Yacano PB Group will forward, via Next Day Air service, the complete bound volumes of submittals [sic] for receipt by Proform by Thursday, August 21, 2003.

The total value of this work complete is: $937,000.*
*Subject to final review with Ms. Yacano, upon return from her vacation.

Note: Proform agrees to provide full payment on valid invoices, less retainage and any disputed amounts, within 10 days of receipt of payment by the Owner.

Exhibit A, attached to Complaint.

On September 19, 2005, PBG owner Kevin Lewis and Proform Project Manager Jeff

Curran executed a "PROFORM CHANGE ORDER #671-1" (Change Order), which reads:

This deduct change order is for work within the original scope of PB Group's contract that was instead performed by Proform Construction on the University of Michigan project.

**The total amount of this change order is:         [$95,000.00]**

This amount will be deducted from your contract.

Exhibit B, attached to Complaint.

By letter dated October 28, 2006, PBG's Lewis informed Proform, Gilbane, NASIC,

and The Regents of the University of Michigan that PBG demanded payment of $166,561.00 for Proform's alleged breach of the August 20, 2003 Purchase Order:

> Because of delays not caused by PB Group, problems at the job site beyond the control of PB Group, and work performed by PB Group at the request and direction of Proform beyond base contract work, PB Group incurred costs, damages and expenses, outlined below totaling $166,561[.]

Exhibit C, attached to Complaint. Examples of delays, problems, and work allegedly performed by PBG outside the scope of the Purchase Order included "Parts lost or ruined on job," "Required validation testing," "Increase in material costs due to job site delays," and "drafting time and overnight [c]harges for equip[ment] placement [l]ocations requested J. Curran overnight." Id. This $166,561.00 is the subject of this lawsuit.

## II. Summary Judgment

Proform moves for summary judgment arguing PBG's claim for $166,561.00 is unsupported by a timely change order executed by Proform, Gilbane, and The Regents of the University of Michigan, as required under Proform's contract with Gilbane, and as incorporated by reference into Proform's and PBG's August 20, 2003 Purchase Order. Proform continues that PBG's course of conduct during the project, demanding that Proform sign change orders before performing work PBG believed fell outside the scope of the August 20, 2003 Purchase Order, supports a finding that PBG is not entitled to recovery in the absence of an executed change order. Proform argues that PBG's Lewis agreed at a September 2005 meeting with Proform President Doug Petty to settle Proform's demand for a $125,000.00 "back charge" by accepting a lesser $95,000.00 reduction in the contract price, as reflected in the September 19, 2005 Change Order, in return for receiving previously withheld retainage as full payment. Proform maintains that PBG's Lewis also

4

agreed to complete the remainder of the project without further compensation. Proform contends that PBG's Lewis only later revealed in a September 26, 2005 e-mail to Gilbane's Mark Cunningham that Lewis never intended to honor the September 2005 agreement. Proform proffers evidence that Lewis thereafter unilaterally altered a "Receipt and Waiver of Mechanic's Lien" form by: (1) changing the condition "NO ERASURES OR ALTERATIONS MUST BE MADE" to "NO ERASURES OR ALTERATIONS MUST BE MADE: By the undersigned"; (2) changing the condition "in final payment of" to "in payment of"; (3) changing the limitation that PBG "waives all rights" to PBG "reserves all rights"; and (4) cutting and pasting Proform's fax legend onto the form to conceal the changes. Proform maintains that Lewis did not disclose these changes to Proform, causing Proform to release $47,723.05 to PBG under false pretenses, thereby binding PBG to the unaltered terms of the form.

PBG responds that its claim for $166,561.00 is for completing Proform's work for Gilbane, replacing materials damaged by Proform, and for additional costs PBG incurred as a result of Proform's inefficiencies and poor job performance. Although PBG concedes that the prime contract between Proform and Gilbane includes formal change order requirements, PBG argues that the Proform/Gilbane prime contract was not incorporated into the August 20, 2003 Purchase Order because the prime contract was executed two months after the Purchase Order, the Purchase Order incorporated only "executed documents," and PBG never received an executed copy of the Proform/Gilbane prime contract. PBG continues that, even if it is bound by the terms of the Proform/Gilbane prime contract, the contract's notice requirements are inapplicable because the costs associated with the instant claims could not be "passed through" to Gilbane. PBG contends that

5

Proform waived any contractual right to a written change order by insisting that PBG perform the additional work.  Alternatively, PBG asserts that its agreement to complete Proform's work constituted a separate contract to perform "new work" outside the scope of the August 20, 2003 Purchase Order.  PBG denies agreeing to complete Proform's contractual duties at no additional cost, noting that the September 19, 2005 Change Order drafted by Proform does not include "settlement" language.   PBG maintains that Lewis' modification of the August 3, 2005 lien waiver was lawful, and consistent with PBG's contractual right to seek additional compensation.  PBG argues the modifications on the release and waiver form were readily apparent, and therefore cannot support a counterclaim of fraud.  PBG maintains that the parties' prior course of conduct under the August 20, 2003 Purchase Order is irrelevant because PBG finished Proform's work under a new contractual agreement.

**A. Standard of Review**

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).  The evidence and all reasonable inferences must be construed in a light

most favorable to the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

### B. Michigan Law

This court must apply Michigan's conflict of law rules.  See Banek Inc. v. Yogurt Ventures U.S.A., Inc., 6 F.3d 357, 361 (6th Cir. 1993).  The parties agree Michigan law is controlling.  See Wonderland Shopping Center Venture Ltd. Partnership v. CDC Mortgage Capital, Inc., 274 F.3d 1085, 1092 (6th Cir. 2001); Equitable Life Assurance Society of the United States v. Poe, 143 F.3d 1013, 1016 (6th Cir. 1998); Chrysler Corporation v. Skyline Indus. Serv., Inc., 448 Mich. 113, 120, 120 n.14, 125, 528 N.W.2d 698 (1995).  The court will apply Michigan law.

A court's obligation in interpreting a written contract is to discern the contracting parties' intent.  Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 375, 666 N.W.2d 251 (2003) (citing Sobczak v. Kotwicki, 347 Mich. 242, 249, 79 N.W.2d 471 (1956)).  This intent is to be determined in light of the surrounding circumstances and

from a reading of the instrument as a whole. Cleveland v. Detroit Trust Co., 264 Mich. 253, 257, 249 N.W.2d 842 (1933). If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy. Quality Products, 469 Mich. at 375 (citing Farm Bureau Mut. Ins. Co. of Michigan v. Nikkel, 460 Mich. 558, 570, 596 N.W.2d 915 (1999)); Port Huron Ed. Ass'n v. Port Huron Area School Dist., 452 Mich. 309, 323, 550 N.W.2d 228 (1996) (citing Dykema v. Muskegon Piston Ring Co., 348 Mich. 129, 138, 82 N.W.2d 467 (1957)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." UAW-GM Human Resource Center v. KSL Recreation Corp., 228 Mich. App. 486, 491-492, 579 N.W.2d 422 (1998) (quoting Dillon v. DeNooyer Chevrolet Geo, 217 Mich. App. 163, 166, 550 N.W.2d 846 (1996)). Extrinsic evidence may be used "to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists." Wonderland Shopping Center, 274 F.3d at 1095 (citing Am. Anodco, Inc, v. Reynolds Metals Co., 743 F.2d 417, 422 (6th Cir. 1984)).

### C. Analysis

PBG concedes, as it must, that the prime contract between Proform and Gilbane required the submission of formal change orders. Article 8.1 of the Proform/Gilbane prime contract provides in part that "The Trade Contractor, prior to the commencement of [] changed or revised work, shall submit promptly to the Construction Manager written copies of any claim for adjustment to the contract sum and contract time for such revised work in a manner consistent with the contract documents." Proform January 11, 2008 Exhibit S, at 7. "General Conditions" governing the Proform/Gilbane prime contract define a "Change

Order" as being a written instrument signed by both the "Construction Manager" and "Contractor" "stating their agreement" to a change in "the Work," the "Construction Time," and/or "the Contract Price." Id. at 5.  "Contractor" is defined to include "all Subcontractors and Suppliers to the Contractor." Id. at 6.  The Proform/Gilbane contract obligated Proform to "require each Subcontractor and Supplier to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor assumes toward the Construction Manager and Owner." Id. at 26.  Sections I1.1.4, I1.1.4.1, and I1.1.4.2 of the "General Conditions" of the Proform/Gilbane contract expressly provide:

> I1.1.4 Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly with the Work involved, unless the Change Order or Construction Change Directive provides otherwise.  Any change in the ContractPrice or the Construction Time must result from the provisions of this Part I.  Accordingly, no verbal instructions, course of conduct or dealings between the parties, except as expressly permitted by Section I1.1.4.1 below, nor express or implied acceptance of alterations or addition to the Work, and no claim that the Owner has been unjustly enriched by any alteration or addition to the Work, whether or not there is, in fact, any unjust enrichment to the Work, shall in the absence of a written Change Order or Construction Change Directive be the basis of any claim to an increase in any amounts due under the Contract Documents or a change in any time period provided for in the Contract Documents.  All such claims are hereby waived by the Contractor and are forever barred.

> I1.1.4.1 When time does not permit the processing of a Change Order in advance of commencing the change in the Work, upon receipt of a Construction Change Directive from the Owner, the Contractor shall proceed with a change in the Work, and the Contractor shall concurrently proceed with preparation and submission of a proposed Change Order.

> I1.1.4.2 EXCEPT AS PROVIDED IN SECTION I5.1 BELOW, OR SECTION I1.1.3.1 ABOVE, IN NO EVENT SHALL THE CONTRACTOR BE ENTITLED TO RECEIVE ANY PAYMENT OR ANY EXTENSION OF TIME FOR ADDITIONAL OR CHANGED WORK, WHETHER PARTIALLY OR FULLY COMPLETED OR SIMPLY PROPOSED, UNLESS SUCH ADDITIONAL

9

> WORK IS AUTHORIZED BY A WRITTEN CHANGE ORDER OR CONSTRUCTION CHANGE DIRECTIVE SIGNED BY THE CONSTRUCTION MANAGER, NOR SHALL THE CONTRACTOR BE OBLIGATED TO PROCEED WITH ANY SUCH WORK. ONLY THE OWNER SHALL HAVE THE RIGHT TO ISSUE A WRITTEN CHANGE ORDER OR CONSTRUCTIVE CHANGE DIRECTIVE TO THE CONTRACTOR AUTHORIZING AN ADDITION, DELETION OR OTHER REVISION IN THE SCOPE OF THE WORK AND/OR ADJUSTMENT IN THE CONTRACT PRICE OR THE BASELINE CONSTRUCTION SCHEDULE. THE CONTRACTOR WAIVES THE RIGHT TO RECEIVE ANY PAYMENT OR ANY EXTENSION OF TIME FOR ADDITIONAL OR CHANGED WORK AND AGREES THAT THE OWNER SHALL NOT BE OBLIGATED TO PAY FOR ANY ADDITIONAL OR CHANGED WORK, NOR SHALL THE CONTRACTOR BE ENTITLED TO AN EXTENSION OF TIME FOR SAME, UNLESS THE CONSTRUCTION MANAGER, CONTRACTOR, AND THE OWNER HAVE EXECUTED A WRITTEN CHANGE ORDER WHICH SETS FORTH THE DOLLAR AMOUNT OF THE ADJUSTMENT TO THE CONTRACTPRICE . . . .

Id. at 36. Section I5.1 provides in relevant part that "if the Contractor believes any act, error, or omission of the Owner or persons for who Owner is responsible . . . constitutes a change in the work entitling it to additional compensation, it shall within fifteen (15) days after the Contractor discovers, or should with the exercise of appropriate diligence have discovered, the pertinent act, error, or omission, . . . submit a Change Order Request . . . ." Id. at 40. Reading the clear and unambiguous instrument as a whole, the Proform/Gilbane prime contract required Proform subcontractors such as PBG to submit and be paid under written change orders signed by Proform and the subcontractor stating their agreement to changes in the work and construction price. Quality Products, 469 Mich. at 375; UAW-GM Human Resource Center, 228 Mich. App. at 491-492. In no event was a subcontractor entitled to payment for additional or changed work "UNLESS SUCH ADDITIONAL WORK IS AUTHORIZED BY A WRITTEN CHANGE ORDER." Proform January 11, 2008 Exhibit S, Section I1.1.4.2, at 36. Quality Products, 469 Mich. at 375;

UAW-GM Human Resource Center, 228 Mich. App. at 491-492.

In turn, the clear and unambiguous language of the August 20, 2003 Purchase Order signed by PBG and Proform expressly incorporated the requirements of the Proform/Gilbane prime contract into the PBG/Proform contract:

> In addition to those items specifically outlined in the specification, the vendor [PBG] must comply with the full letter and intention of that document and all subsequent revisions, addendums, post bid supplements, <u>and additional requirements as outlined on executed contracts between Gilbane/Clark and Proform that may pertain to this subcontract.</u>

Exhibit A, attached to Complaint (emphasis added). PBG's argument that the August 20, 2003 Purchase Order only incorporated documents that had been "executed" by Proform and Gilbane prior to August 20, 2003 relies upon a constrained construction of the contract language. UAW-GM Human Resource Center, 228 Mich. App. at 491-492. In the case of subcontracts, as with any express written agreements, contracting parties may incorporate by reference an extraneous writing. Omega Construction Co., Inc. v. Altman, 147 Mich. App. 649, 382 N.W.2d 839 (1986) (quoting Arrow Sheet Metal Works, Inc., 338 Mich. 68, 78, 61 N.W.2d 125 (1953)). Contrary to PBG's argument, parties to an agreement may incorporate by reference documents that are not yet even in existence, let alone existing agreements that have not yet been executed. See Levy v. Verizon Information Services, Inc., 498 F. Supp.2d 856, 594, 594 n.6 (citing Lamb v. Emhart Corp., 47 F.3d 551, at 554, 558 (E.D.N.Y. 2007)). Although the knowledge and assent may be missing when a contract binds parties to terms that are to be decided in the future, knowledge and assent may be found in the circumstances surrounding the agreement. Lamb, 47 F.3d at 558 (citing Housing Auth. of City of Hartford v. McKenzie, 36 Conn.Supp. 515, 518-19, 412 A.2d 1143, 1145 (Conn.Super.Ct. 1979)). See also 1 Williston on Contracts, § 4:30 (4th ed.)

(stating that "[a]n . . . agreement . . . may even refer to a contract to be made subsequently"). The undisputed circumstances surrounding the August 20, 2003 Purchase Order signed by PBG and Proform demonstrate that PBG was provided a copy of the sample unsigned Proform/Gilbane prime contract during the bidding process. See Proform's February 19, 2008 Exhibits. Further, PBG initiated and had Proform execute written change orders during the course of the construction contract to facilitate payment to PBG for additional or changed work. See Proform's January 11, 2008 Exhibits H-R. Any possible contractual ambiguity relative to incorporating the written change order requirement of the Proform/Gilbane prime contract into the PBG/Proform contract is dispelled beyond dispute by the evidence of the circumstances surrounding the parties' August 20, 2003 Purchase Order. Wonderland Shopping Center, 274 F.3d at 1095. PBG's argument that it is not bound by the change order requirement incorporated by reference from the Proform/Gilbane prime contract into the August 20, 2003 Purchase Order because PBG was not provided with a copy of the signed Proform/Gilbane prime contract is not well taken. In light of the express language of the August 20, 2003 Purchase Order and Proform/Gilbane prime contract, as well as the surrounding circumstances, PBG's argument that it was not required to execute a written change order to secure payment for the instant claims because the costs could not be passed through to Gilbane is likewise without merit. Construing the pleadings and evidence in a light most favorable to PBG, PBG is not entitled to additional payment unless the services were authorized by Proform under a written change order signed by Proform. Amway Distributors, 323 F.3d at 390; Quality Products, 469 Mich. at 375; UAW-GM Human Resource Center, 228 Mich. App. at 491-492.

PBG's argument that parties' reached a "new" agreement during a September 2005 meeting between PBG's Lewis and Proform's Petty is undercut by the undisputed September 26, 2005 e-mail sent by Lewis to Gilbane's Cunningham:

> Mark, I wanted to give you an update on the status of our situation with Proform over payments due us for your project.
>
> As you know I met with Doug Petty and Jeff Curran in their offices near Minneapolis. last sept 7th. I spoke with you after that meeting, explaining the backcharge amount that they were seeking from PB Group.
>
> \* \* \*
>
> After a few days consideration, and after speaking again with our attorney, and other trusted business associates in similar situations in the past, *I decided to make a deal. . . . .* Longer periods of waiting for outcomes of any arbitration, litigation, with associated loss of interest, continued negative cash flow on the project, and legal fees, etc. were weighed *against a settlement which would give us all our current balance, less our retainage, which was the deal offered by Petty.* So we needed the money, and wanted to remove the debt balance and collection unknowns form the equation, and *I settled agreeing to take a $95,000 back charge*.
>
> I fully expected a separate settlement agreement, complete with the above non-disclosure clauses, etc, and I was surprised when Jeff faxed me a single change order reducing our PO by the 95,000 as "work performed by Proform" with no other wording on it, just about two sentences and the amount. *I signed the changes [sic] order, faxed it back, and received our 173,000 overnight the next day. This was the balance owed, less the $95,000 change order agreement, and less the aprox [sic] $95,000 retainage that Proform is still holding.* Doug Petty had told me that he would pay us our entire retainage amount as soon as he either received his retainage, or he said he would also pay us this entire amount as soon as he was able to get a reduction in the retainage Gilbane is holding. I believe this amount should be in the $140,000 class.
>
> \* \* \*
>
> . . . . *I had worked towards inducing Proform to accept my offer to them*, which I voiced during our sept 7th meeting, after they presented me with their "backcharge" evidence, which was prepared by a professional construction managment [sic] firm who specializes in such "back charge" presentation packages, and whom Proform has used often before I was proudly told. *My*

13

*offer to them was to let PB Group "finish" the job for them.* After all, I suggested, all the material is in place, and all that's really left is the performance testing and some minor lose ends, and so the testing is our responsibility anyway, so *why don't you just authorize us to handle the project completion, and that would ofcourse [sic] end your continued expenses*, and need for continued job site presence, etc. My objective was to get buy in to this concept as it would pave the way for PB Group to clean up the act and polish it off with our business philosophy to insure a satisfied client. *My further alterior [sic] motive, I will share with you, was to allow Proform to fall into a false security* of my seeming reaction to PB Group's predicament of being between a rock and a hard place in needing to potentially succumb to their trumped up charge routine, for which that meeting was designed for, hoping that I would acquiesce to their waiving of "lawyer" ready portfolios of "documented back charges." *I accomplished my goal of having Proform break the cardinal rule in contract construction underwritten by personally obligated and secured performance and payment bonding: namely they "didn't finish the job."* . . . . While Proform is not officially "walking away" from the job, Petty did tell me in no uncertain terms that unless he received his next payment and all payments from Gilbane, that he was not going to support any warranty claims, or return to the job. *That's the moment I voiced my offering, which Proform took hook, line, and sinker.* So they appointed me the "point man" and *I agreed to finish the job for them*, although they wanted to stay in the loop of any correspondence, and *Jeff would still have some ultimate authority in terms of PB Group obligating Proform to any additional work or expenses. My intention was purely to do whatever I had to do to get the job finished* correctly, again with our customer philosophy, and *I was internally prepared to pay whatever it took to do it out of PB Group funds, with the intention of having possibly some reverse claims against Proform, or their bonding company.* That remote possibility was not paramount in my thought, I did want to take the job out of their hands to do it right, and quickly; but I postured if I could accomplish that primary goal, and still lay the groundwork for some recovery from our backcharge dilema [sic], that this would possibly be a win/win for both PB and U of Mich.

\*   \*   \*

 . . . . *Jeff has independently instructed me not to "give away the store" in agreeing to do any work which could be a potential basis for change order.* I can understand this approach, and to some degree *I currently need to follow a course of action that makes some appearance that I am complying with Jeff's request*, however I am proceeding to do and authorize work to be done using our PB Group purchase orders to these vendors to get them to perform the work. We will pay all these vendors within reasonable time frames of normal course of business, and *I will continue to do this up to the point where Proform may step back in and say stop, even though they are*

14

> *not technically on the payment hook*, as all directives are coming from me and we are issuing our PO's to these vendors. I will try to keep Jeff at bay for as long as I can, and of course ultimately I don't believe Proform can do anything to stop us from paying people to do work we issue separate orders for. I prefer to keep Proform off the job from here on in, and that would allow me the freedom to finish the work using our determination of what has to be done, without interference. Soon, I would suspect, once Proform starts the litigation process, as I have illustrated above we might come to some point where Proform is officially removed from the job, and PB Group may be assigned officially to finish the project, but either way whether by authority or not, *we will finish the job correctly, underwrite the associated cost, and we are knowingly on our own in any quest to recoup any of these expenditures.* Unless there is some directive to the contrary from Gilbane, or some contractual determination that we are forced to cease any such work, we will continue within the confines of all the above plan of action.
>
> Mark, you may be best off deleting this e-mail once you have read it, and not choosing to forward it to anyone as it may not be in Gilbane's best interest in the event of any litigation causing "discovery" of documents, etc. I will delete it on my end as well.
>
> Sorry for the long dissertation, but it's a long story and there is a lot of money at stake. Thanks again for all your help.
>
> Sincerely
> Kevin Lewis

Proform's January 11, 2008 Exhibit E (emphasis added). Lewis' deposition testimony is consistent with the e-mail.

As Lewis' testimony and e-mail shows, PBG reached a deal with Proform and agreed to take the $95,000.00 contract price reduction, as supported by the September 19, 2005 "PROFORM CHANGE ORDER #671-1" (notwithstanding a lack of "settlement language"), in exchange for overnight receipt of $173,000.00, and agreed to finish the job for Proform, which "would of course end [Proform's] continued expenses." As expressed by Lewis, Proform accepted PBG's offer "hook, line, and sinker." PBG "was internally prepared to pay whatever it took to do it out of [PBG] funds, with the intention of having

15

some reverse claims against Proform, or their bonding company." To that end, PBG followed a "course of action" that gave Proform the appearance that PBG agreed to perform work which would not "be a potential basis for a change order," finishing the job and underwriting the cost. Lewis's and Curran's testimony that additional compensation was not discussed at the September 2005 meeting is consistent with PBG's agreement to finish the job for Proform, and end Proform's continuing expenses by paying to complete the job. Any actionable "reverse claims" against the August 20, 2003 Purchase Order requires a supporting written change order signed by PBG and Proform. Amway Distributors, 323 F.3d at 390; Quality Products, 469 Mich. at 375; UAW-GM Human Resource Center, 228 Mich. App. at 491-492. Proform has failed to come forward with evidence that would support a finding on this record that Proform and PBG agreed under a separate contract to perform "new work," entitling PBG to be paid for finishing the Proform/Gilbane prime contract without a written change order signed by Proform. First Nat'l Bank, 391 U.S. at 270; Anderson, 477 U.S. at 248; McLean, 224 F.3d at 800.

PBG has likewise failed to proffer clear and convincing evidence that Proform intentionally and voluntarily waived its right to a signed change order. Quality Products and Concepts Co. v. Nagel Precision, Inc., 469 Mich. 362, 374, 666 N.W.2d 251 (2003). Indeed, Lewis' e-mail and admitted unilateral altering of the "Receipt and Waiver of Mechanic's Lien" form shows that Proform did not waive its right to a signed change order, accepting Lewis' offer to complete the project at no additional cost to PBG "hook, line, and sinker."

Construing the pleadings and evidence in a light most favorable to PBG, PBG cannot recover on its breach of contract claim unless PBG proffers a written change order

16

signed by Proform authorizing PBG to complete the project at a cost of $166,561.00. Amway Distributors, 323 F.3d at 390; Quality Products, 469 Mich. at 375; UAW-GM Human Resource Center, 228 Mich. App. at 491-492; Wonderland Shopping Center, 274 F.3d at 1095. PBG admittedly cannot produce such evidence. The law will imply a contract to prevent unjust enrichment only if there is no express contract. Martin v. East Lansing School District, 193 Mich. App. 166, 177-178, 483 N.W.2d 656 (1992). Here, the parties' express contract required a written change order. PBG has not come forward with evidence of a promise made by Proform to pay PBG to complete the project, and thus, PBG cannot recover on its claim of promissory estoppel. See Schmidt v. Bretzlaff, 208 Mich. App. 376, 378-379, 528 N.W.2d 760 (1995). Equity in the form of quantum meruit or quantum valibut is unavailable to PBG on this record as Lewis' wilful conduct as reflected in his e-mail and unilateral altering of the "Receipt and Waiver of Mechanic's Lien," even if not actionable as fraud, indicates overreaching and unfairness that bars equitable relief. See Royce v. Duthler, 209 Mich. App. 682, 688-689, 531 N.W.2d 817 (1995). "He who seeks equity must do equity." Grabendike v. Adix, 335 Mich. 128, 140, 55 N.W.2d 761 (1932). Proform is entitled to summary judgment of PBG's claims as a matter of law. Amway Distributors, 323 F.3d at 390.

### III. Leave to Amend

Proform seeks leave to amend its answer and its complaint to add affirmative defenses and counterclaims of fraud against PBG and Lewis based on Lewis' lack of intent to honor the parties' September 2005 agreement, and Lewis' altering of the receipt and waiver form. Proform conceded at the hearing that the motion would be moot if Proform was granted summary judgment. Accordingly, Proform's motion for leave to file an

17

amended answer and conuterclaims will be denied as moot.

## IV. Proform's Counterclaims

Proform's counterclaims of breach of contract, negligence, breach of warranty, promissory estoppel, and negligent misrepresentation remain to be adjudicated. The counterclaims are based generally on twelve alleged "deficiencies," alleging damages "in excess of $75,000.00." Unlike its agreement that its motion to amend to add a counterclaim of fraud is rendered moot with the dismissal of PBG's claims, it is unclear to the court whether Proform believes its remaining counterclaims have also been rendered moot. Proform will be ordered to inform the court whether it will proceed to trial on the remaining counterclaims, or whether these counterclaims have also been rendered moot.

## V. Conclusion

For the reasons set forth above, Proform's motion for summary judgment is hereby GRANTED. PBG's claims are hereby DISMISSED in their entirety. Proform's motion for leave to amend to add affirmative defenses and counterclaims of fraud is hereby DENIED as MOOT. Proform is hereby ORDERED to file a writing with the court, on or before July 18, 2008, informing the court whether Proform intends to proceed to trial on its remaining counterclaims, or the remaining counterclaims have been rendered moot with the dismissal of PBG's claims.

SO ORDERED.

Dated: July 8, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on July 8, 2008, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk